UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LABORERS DISTRICT COUNCIL PENSION AND DISABILITY TRUST FUND NO. 2, AND GEORGE MALONEY AS CO-CHAIR,<br><br>    Plaintiff,<br><br>v.<br><br>WHITING-TURNER CONSTRUCTION COMPANY,<br><br>    Defendant. | Civil Case No. _____ |

## COMPLAINT TO VACATE ARBITRATION AWARD

Plaintiff Laborers District Council Pension and Disability Trust Fund No. 2 (the "Fund"), by and through its attorneys, and for its Complaint against Defendant Whiting-Turner Construction Company ("WT"), pursuant to 29. U.S.C. §1401(b), states and alleges as follows:

## NATURE OF THE ACTION

1. This Action seeks to vacate a clearly erroneous arbitration award relating to withdrawal liability for unfunded liability incurred by WT over decades as a contributing employer to the Fund, a defined benefit multiemployer pension plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. § 1001, et. seq., and for related relief.

2. In 1980 Congress amended ERISA and enacted the Multiemployer Pension Plan Amendments Act ("MPPAA"), which requires employers withdrawing from multiemployer pension plans to pay the unfunded vested benefits attributable to the withdrawing employers' participation. *Connolly v. Pension Benefit* Guaranty *Corp.,* 475 U.S. 211, 217 (1986). Specifically, 29 U.S.C. § 1383(a) states that a "complete withdrawal" occurs if there is either: (1)

1

a permanent cessation of an employer's obligation to contribute under the plan, or (2) a permanent cessation of an employer's covered operations under the plan.

3. The purpose of withdrawal liability is to ensure that an employer withdrawing from a pension plan provides adequate funds to pay the employer's fair share of unfunded liabilities that would otherwise fall on the remaining contributing employers. *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund,* 859 F.2d 808, 811 (9th Cir. 1988) (quoting *Connolly*, 475 U.S. at 215-16). In general, the amount of an employer's withdrawal liability is the employer's share of the plan's unfunded vested benefits. *See* 29 U.S.C. § 1391.

4. The Fund assessed WT with its allocable share of unfunded withdrawal liability, and WT challenged the Fund's assessment based on a claim that it qualified for an exception to the imposition of withdrawal liability, the "construction industry exception." Ex. 1, January 30, 2018 Assessment of Withdrawal Liability; Ex. 2, April 27, 2018 Request for Review, §1(c).

5. The arbitrator's award was erroneous as a matter of law with respect to following: (1) the arbitrator's decision was erroneous because it is contrary to longstanding case law and regulatory precedent that excuses WT's obligations under ERISA by creating a non-existent *de minimis* exception to ERISA's withdrawal liability provisions; (2) the arbitrator's decision was erroneous because it is contrary with longstanding case law and regulatory precedent that multiemployer pension funds are not imputed with knowledge of a local union's day-to-day operations regarding its members; (3) the arbitrator's decision is contrary to longstanding precedent involving basic contract law doctrine that a party may not benefit from their own breach of agreement; and (4) the arbitrator's decision was clearly erroneous because his factual findings are contrary to the irrefutable record evidence, including but not limited to inconsistent false testimony by numerous WT executives and management, extensive violations of WT's own

corporate policies and hundreds of hours of video evidence highlighting WT's violation of ERISA.[1]

6. The parties do not dispute the material facts relevant to these issues. Therefore, each is a question of law that this Court reviews *de novo*. In an ERISA withdrawal liability dispute, "the decisions of the arbitrator, like the decisions of a typical administrative agency, are fully reviewable to determine whether the applicable statutory law has correctly been applied and whether the findings comport with the evidence." *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1207 n.7 (D.C. Cir. 1984) (citing 29 U.S.C. § 1401(a)(3)(A)).

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 29 U.S.C. §§ 1401(b)(2) and 1451(c).

8. This Court has jurisdiction to vacate or modify the arbitrator's award upon completion of the arbitration proceedings, under to 29 U.S.C. § 1401(b)(2).

9. Venue is proper in this Court under 29 U.S.C. § 1451(d) because the Defendant is incorporated and headquartered in the state of Maryland, and additionally the Plan is administered in the state of Maryland.

## PARTIES

10. Plaintiff Laborers District Council Pension and Disability Trust Fund No. 2 (the "Fund") is a "multiemployer fund" within the meaning of 29 U.S.C. § 1301(a)(5) which administers a multiemployer pension plan within the meaning of 29 U.S.C. § 1002(37) and 1301(a)(3) (the "Plan"). The Fund is administered in Columbia, Maryland.

11. Defendant WT is a Maryland corporation with its headquarters in Towson, Maryland. WT is an employer within the meaning of 29 U.S.C. § 1002(5) and as referenced in 29

---

[1] All exhibits were accepted into evidence by the arbitrator at the start of the 5-day hearing. Ex. 3, Tr. 5-6

U.S.C. § 1301(a)(3). *See Rheem Mfg. v. Cent. S.E. and S.W. Pen. Fund*, 63 F.3d 703, 706 (8th Cir. 1995) (quoting *Seaway Port Auth. v. Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503, 509) (holding that, for purposes of MPPAA liability, an "employer" is an entity that has assumed a contractual obligation to make contributions to a pension fund).

## BACKGROUND

### A.   WT Terminates its Collective Bargaining Agreement and Initiates Arbitration to Avoid Withdrawal Liability

12.     WT is one of the largest construction companies in the United States, and has and continues to have a huge presence in the construction market in the Baltimore-Washington region.

13.     WT was for decades signatory to collective bargaining agreements ("CBA") with the Laborers International Union of North America, Baltimore/Washington Construction and Public Employees Laborers' District Council, and Local Unions 11 and 657 (and its predecessors) (collectively, the "Union"), regarding its jurisdictional work in specific areas of D.C., Virginia, and Maryland.

14.     WT's CBAs specifically identified every job responsibility at a work site that constituted Laborers jurisdictional work. Ex. 4, 2014-17 CBA at Appendix A. Under its CBA, WT was required, among other things, to make contributions to the Fund on behalf of its covered employees performing Laborers jurisdictional work, and did so for decades.

15.     On January 25, 2017, WT sent a letter to the Union abrogating its CBA. As a result, pursuant to 29 U.S.C. § 1383(a), there was a cessation of WT's obligation to contribute to the Fund triggering its complete withdrawal, effective May 31, 2017. Ex. 5, January 25, 2017 Letter.

16.     On January 30, 2018, the Fund assessed withdrawal liability against WT pursuant to the 29 U.S.C. § 1399 based upon unfunded vested benefits liabilities as of December 31, 2016 (the end of the Plan year immediately preceding the date of the withdrawal), totaling $4,129,147.

Ex. 1, January 30, 2018 Withdrawal Liability Assessment.

17. On September 20, 2018, WT initiated arbitration with the American Arbitration Association ("AAA") under 29 U.S.C. § 1401, challenging the actuarial assumptions used to calculate the amount of withdrawal liability, and further arguing that it was not subject to *any* withdrawal liability under the "construction industry exemption," 29 U.S.C. § 1383(b) because WT employees did not perform any Laborers jurisdictional work in the area covered by the CBA after its expiration.

18. The AAA arbitration was assigned case number 01-18-0003-5360, and Ira F. Jaffe, Esq. was assigned as the arbitrator in the matter.

### B. The Construction Industry Exemption to Withdrawal Liability

19. The Fund is a construction industry multiemployer pension plan, and MPPAA contains a special exception for employers that contribute to pension plans for workers performing building and construction industry work. *See* 29 U.S.C. § 1383(b). The building and construction industry exception provides:

> (1) Notwithstanding subsection (a) of this section, in the case of an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, a complete withdrawal occurs only as described in paragraph (2) if-
>
> > (A) substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry, and
> >
> > (B) the plan-
> >
> > > (i) primarily covers employees in the building and construction industry, or
> > >
> > > (ii) is amended to provide that this subsection applies to employers described in this paragraph
>
> (2) A withdrawal occurs under this paragraph if-
>
> > (A) an employer ceases to have an obligation to contribute under the plan, and

5

>    (B) the employer-
>
>    >    (i)   continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>    >
>    >    (ii)  resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

20. If an employer is covered by the building and construction industry exception as defined in 29 U.S.C. § 1383(b)(1) above, the analysis moves to 29 U.S.C. § 1383(b)(2). Under these provisions, employers who have ceased making contributions to pension plans on behalf of building and construction industry employees are subject to withdrawal liability only if they continue to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or if they resume such work within five years after the date on which the obligation to contribute ceased. *See also Elliott,* 859 F.2d at 811 (under building and construction industry exception, withdrawal liability is imposed only when a contractor's obligation to the fund ceased, but the contractor continued doing covered work).

**C.     WT's Original Position Attempting to Evade Withdrawal Liability**

21. WT's position from the beginning was that, after expiration of its CBA, no WT employee performed any Laborers jurisdictional work for which contributions were previously required. "Whiting-Turner has not performed work in the jurisdiction of the applicable collective bargaining agreement after the expiration of that agreement." Ex. 2, April 27, 2018 Request for Review, §1(c).

22. WT knew that if any of its employees performed any Laborers jurisdictional work post-expiration of the CBA it would trigger withdrawal liability, and informed all of its supervisory personnel that after expiration of the CBA no WT employee could perform even a minute of Laborers jurisdictional work.

23. After the expiration of WT's CBA, there were some initial efforts to determine whether WT was, contrary to its claim, performing Laborers jurisdictional work and some video clips were obtained that showed WT employees were, in fact, performing Laborers jurisdictional work.

24. Thereafter, the Fund retained a private investigator and over a period of years hundreds of video clips were taken of numerous WT employees at many different construction sites throughout the area covered by the applicable CBA that regularly performed many duties specifically identified as Laborers jurisdictional work in Appendix A of its expired CBA. Ex. 4, CBA at Appendix A.

25. In a transparent effort to avoid the Fund's withdrawal liability assessment, WT executives took an oath and testified that no WT employees performed any Laborers jurisdictional work after the CBA expired. For example, WT's Chief Labor Officer testified that "we know that we do not have any WT employees performing Laborers work in the jurisdiction" because "we subcontract, we instructed all our salaried employees and managers, superintendents all of those duties to either subcontractor vendors, to perform those services." Ex. 6, Earnst Dep. at 94. Mr. Earnst also testified that he knew no WT employee could perform even a second of Laborers jurisdictional work after expiration of the CBA. Ex. 3, Tr. 481-822, 1920-29.

26. In addition, Arch Jamieson, confirmed in his testimony that the Laborers jurisdictional work specified in Appendix A and that after expiration of the CBA "no direct hire of WT could perform any of the work on a job site" and testified "no other jurisdiction could do that work." (Ex. 7, Jamieson Dep at 66).

27. WT had a Foundations of Excellence which were mandatory company policies that expressly states that "general conditions work must be performed by a subcontractor performing

7

other work on the project or another independent labor contracting company. Earnst Dep at 159-60. Mr. Earnst also testified that "general conditions work in our vernacular is cleanup, site safety, those types of activities." Earnst Dep at 156.

28. Referring to the Foundations of Excellence, Mr. Earst testified "[t]hat's our policy," and there are no "deviations from that policy." Earnst Dep. at 89. Mr. Earnst also testified that "it is our expectation" that WT employees follow the company's mandatory policies. Earnst Dep at 170 Mr. emphasized that there was "absolutely no exception" to WT's Foundations of Excellence, even if it was "performed [] for a minute to a minute and a half." Ex. 8, Earnst 3/14/22 Corporate Representative Dep. at 259-260.

### D. WT's Transparent Reversal of Position to Evade Withdrawal Liability

29. Incredibly, after having asserted for approximately four years that no WT employee had performed any Laborers jurisdictional work, after the Fund produced the video clips it intended to use in the arbitration and having been caught in their employees' false and/or misleading deposition testimony, WT completely shifted its position in the arbitration.

30. After having been shown the irrefutable evidence that WT employees had, indeed, performed Laborers jurisdictional work after the expiration of the CBA, WT audaciously reversed its defense months before the arbitration hearing claiming that WT employees (including non-bargaining unit supervisors) had always performed Laborers jurisdictional work – before and after expiration of the CBA. In this regard, Mr. Earnst confirmed WT's knowledge that prior to the expiration of the "2014 CBA" that no "salaried Whiting-Turner employee" was permitted to perform any Laborers jurisdictional work before the expiration of the 2017 CBA. Earnst Dep at 286-87. Mr. Earnst also confirmed in his sworn testimony that "no Whiting-Turner employee was permitted to perform any laborers jurisdictional work [] defined in Appendix A of the 2014/2017 CBA after June 1, 2017." *Id.* Ex. 6 at 481-82, 1920-29.

8

31. After having testified numerous times that WT employees never performed Laborers jurisdictional work, WT's Chief Labor Officer, Michael Ernst, testified at the arbitration that WT employees had always performed Laborers jurisdictional work both before and after its termination, despite the fact that it was a blatant violation of the CBA. Ex. 3 at Tr. 615 – 618; 635:6-636:2; 638:4-14; 639; 641 667:9-21; 678:17-681:1.

32. Having been caught with this irrefutable evidence of it is years-long deception, WT stipulated to facts that unambiguously admit that it performed Laborers jurisdictional work under the CBA after its expiration. Ex. 9, Joint Stipulations 11-14, 22-32, 51-77.

33. WT *stipulated* that "[a]fter May 31st, 2017, *no [Whiting-Turner] employees, including salaried employees or hourly employees*, were permitted to perform Laborers' jurisdictional work," (Joint Stipulation 38), and that WT employees *performed Laborers' jurisdictional work after May 31, 2017*. Ex. 9, Joint Stipulations 23-32; 57-73.

34. WT *stipulated* that WT supervisor Jason Marchetti performed Laborers' jurisdictional work at the Catholic University project after the expiration of the CBA. *See* Ex. 9, Joint Stipulations 12-13, 30.

35. In addition to the testimony of WT employees and these stipulated facts, witness testimony and video evidence from the Fund evidenced the irrefutable fact that WT employees were performing work of the type in the jurisdiction following the termination of the CBA. *See e.g.* Ex. 3, testimony of Steve Lanning (Tr. 1003:19-1004:5); Raymin Diaz (Tr. 1145:7-21); Jonathan Viera (Tr. 1231:21-1269:17-22); Scott Kucik (Tr. 1317:15-1318:7).

36. During the course of the arbitration, approximately 200 videos were produced by the Fund, in support of its position that WT was subject to withdrawal liability.

37. The Fund had no knowledge that WT employees were performing Laborers

9

jurisdictional work until after expiration of the CBA.

38. Due to the COVID-19 global pandemic, the arbitration process spanned additional years.

39. Arbitration hearings were held on April 11-14, 2022, and May 3, 2022. The parties filed post-hearing briefs, the last of which was filed on August 22, 2022.

40. For approximately four years of the arbitration, WT maintained that its employees had not performed any Laborers jurisdictional work under the CBA after expiration on May 31, 2017 and, therefore, was entitled to the protection the construction industry exemption under ERISA, 29 U.S.C. § 1383(b), and are not subject to withdrawal liability.

41. WT maintained this position until faced with irrefutable evidence to the contrary 2022, when the Fund produced approximately 200 videos evidencing WT supervisors and/or managerial employees that clearly performed Laborers jurisdictional work under the CBA of the type that would have led to an obligation to contribute to the Plan under the terms of the CBA.

42. Presented with evidence of work being performed in the jurisdiction, WT reversed their position and asserted *for the first time* that "limited work" was performed by supervisory and/or managerial employees, and further that work was performed by subcontractors on WT's behalf, and did not constitute work in the jurisdiction of the CBA of the type that would have led to an obligation to contribute to the Fund under the terms of the CBA. Ex. 3, Tr. 105:6-106:3; 169:21-171:21; 297:5-20; 445; 731:12-732:8.

### E. The Arbitrator's Erroneous Decision

43. On July 10, 2023, an interim award in favor of WT was issued, finding that WT "did not continue after May 31, 2017 to perform work in the jurisdiction of the 2014 Agreement of the type for which contributions were previously required" and further found that WT "did not resume work in the jurisdiction of the 2014 agreement of the type for which contributions were previously required in the five-year period after May 31, 2017." Ex. 10, Interim Award, at 73.

44. In support of the decision, the arbitrator found that despite the fact that WT employees *did* regularly perform Laborers jurisdictional work after expiration of the CBA of the type for which contributions were previously required, because he concluded the work performed was minimal or *de minimis*, and thus did not trigger 29 U.S.C. § 1383(b)(2).

45. The arbitrator based this unsupported *de minimis* exemption on a single case, *Laborers' Pension Fund v. W.R. Weis Company*, 180 F. Supp.3d 540 (N.D. Ill. 2016), aff'd, 879 F.3d 760 (7th Cir. 2018), which involved a company that terminated a collective bargaining agreement, but was held to be covered by the construction industry exception because the work performed was expressly covered by a special collective bargaining agreement and, thus, there was dual jurisdiction – which is simply irrelevant to this case.

46. On July 3, 2024, a final award consistent with the interim award was issued (the "Award"), overturning the assessment of withdrawal liability, and directing the Fund to refund all withdrawal liability payments made by WT, with interest. The Award calculated the repayment of withdrawal liability payments in the amount of $2,682,477,02. Ex. 11, Final Award.

47. Performance of "even one second" of jurisdictional work by a WT employee after the end-date of the applicable CBAs constitutes performance of "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required," and is in direct violation of 29 U.S.C. § 1383(b)(2)(B)(i). Tr. 481-482; 1920-1929.

### F. Judicial Review and the Applicable Standard

48. Withdrawal liability arbitration awards are subject to independent judicial review under 29 U.S.C. § 1401(b)(2). This Court reviews the legal conclusions of the arbitrator *de novo*, and under a clearly erroneous standard for an arbitrator's findings of fact.

49. The Court may award costs and expenses, including reasonable attorneys' fees to the prevailing party under 29 U.S.C. § 1451(e).

50. The arbitrator made numerous erroneous conclusions of law, and accordingly, the award should be vacated.

51. First, the arbitrator created a "de minimis exemption" to the assessment of withdrawal liability under ERISA where no such exemption exists, finding that the construction industry exemption to withdrawal liability was not defeated by the performance of laborer work in the jurisdiction of the CBA by WT employees because the work was minimal or de minimis.

52. Second, the arbitrator erroneously concluded that the Fund knew of, and somehow waived, WT's breaches of the CBA in performing laborer work in the jurisdiction of the CBA during the time that the CBA was still in effect – and continued work in the jurisdiction after termination of the CBA - because the CBA did not expressly exclude WT's salaried employees. There is no reason any CBA would have an express statement excluding supervisors when, in fact, they are excluded by the National Labor Relations Act as non-bargaining unit, and there is no basis to find that supervisors were tacitly permitted to do laborers' work.

53. Third, the arbitrator erroneously imputed purported knowledge of the Union on the Fund, despite the fact that there was no evidence that the Union had any knowledge of WT's breach of its CBA from WT's salaried employees performing Laborers jurisdictional work, the Fund and the Union are two completely legal separate entities, the Fund is governed by ERISA, and the Fund has no obligation to investigate worksites to enforce withdrawal liability assessments.

54. The arbitrator also made numerous clearly erroneous conclusions of fact, directly contradicted by the record evidence, and accordingly the arbitration award should be vacated.

55. The arbitrator ignored the record evidence comprised of joint stipulations of fact, witness testimony from both sides, and video evidence clearly showing that the laborer work performed by WT employees was not minimal and had been going on for years, including as recently as 2022 during the pendency of the arbitration.

56. The arbitrator failed to address WT's complete reversal of its position or its years-long false and/or misleading statements claiming that none of its employees performed any Laborers jurisdictional work after expiration of the CBA.

57. The arbitrator improperly disregarded the fact that WT witnesses were not credible who falsely and/or misleadingly testified in their depositions stating "[a]ll right. I'm going to cut it a little short. I'm going to allow the question to be posed with the same observation that I've made before, which is I'm not certain that credibility and related opinions with respect to this area are necessarily relevant, never mind dispositive." Ex. 3, Tr. 1919:18-1920:2.  It is submitted that under longstanding precedent that credibility is always relevant.

58. The arbitrator ignored the sworn testimony of the Union representatives who unequivocally testified that that the Union had no knowledge that WT employees were performing Laborers jurisdictional work, until the Union discovered WT doing so well after expiration of the CBA.

59. The Fund respectfully requests a judgment vacating the arbitrator's award, and Order WT to promptly pay withdrawal liability payments as calculated by the Fund in arbitration, and pay the Fund's costs and fees in connection with this litigation.

13

## CLAIMS

### COUNT I: THE AWARD VIOLATES 29 U.S.C. §1383 BY CREATING A *DE MINIMIS* EXEMPTION THAT DOES NOT EXIST AND IS CONTRARY TO ALL PRECEDENT

60. The Fund incorporates by reference paragraphs 1-59 of the Complaint as if fully set forth herein.

61. "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a)

62. All exemptions to withdrawal liability, including what is known as the construction industry exemption, are contained in 29 U.S.C. § 1383.

63. A employer does not qualify for the construction industry exemption if the employer "ceases to have an obligation to contribute under the plan" and the employer "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" *or* "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." 29 U.S.C. § 1383(b)(2).

64. It is undisputed that WT ceased to have an obligation to contribute under the Plan when its CBA terminated effective May 31, 2017.

65. Despite its initial years-long deception through its employees false testimony, it is undisputed that WT continued to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. Ex. 9, Joint Stipulations.

66. It is undisputed that WT resumed such work within 5 years after the date on which the obligation to contribute under the plan ceased and did not renew the obligation at the time of the resumption.

14

67. The arbitrator committed clear error in overturning the Fund's assessment of withdrawal liability by finding that the Laborer's jurisdictional work WT employees continued to perform in the jurisdiction of the CBA for which contributions were previously required was minimal or *de minimis*, and therefore *somehow* did not trigger 29 U.S.C. § 1383(b)(2).

68. In stark contrast to the arbitrator's conclusion, there is no *de minimis* exemption to withdrawal liability in 29 U.S.C. § 1383 or any other part of ERISA or any Federal law.

69. The arbitrator cited a single case as support for his erroneous conclusion, *Laborers' Pension Fund*, 180 F. Supp.3d 540, *aff'd*, 879 F.3d 760. Significantly, the *Weis* case in no way supports the proposition advanced by the arbitrator that a *de minimis* exception exists – the facts are entirely distinguishable, it has never been cited for the proposition advanced by the arbitrator, and does not even contain the phrase "*de minimis*." The arbitrator simply created this *de minimis* exception without any basis, contrary to MPPAA's purpose to protect multiemployer pension funds and their participants and beneficiaries.

70. Courts have rejected the argument that performance of limited, *de minimis* work would not lead to withdrawal liability. *See e.g. H.C. Elliott, Inc.,* 859 F.2d 808.

71. However, even if a *de minimis* exemption *did* apply, the work performed by WT employees was not minimal or *de minimis*, as evidenced by the joint stipulations, witness testimony, and approximately 200 video recordings. Additionally, the work had been occurring for years before discovered.

72. The Court should vacate the arbitrator's award and order withdrawal liability assessment against WT, in addition to Ordering WT to pay the Fund's costs and expenses including reasonable attorneys' fees related to this litigation.

## COUNT II: THE AWARD ERRONEOUSLY CONCLUDES THAT WT'S BREACHES OF THE CBA WERE WAIVED

73. The Fund incorporates by reference paragraphs 1-72 of the Complaint as if fully set forth herein.

74. It is undisputed that WT employees performed laborers work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required under 29 U.S.C. § 1383(b)(2)(B)(i) *both subsequent and prior* to the May 31, 2017 termination of the CBA, in breach of the CBA.

75. The arbitrator committed clear error in finding that the Fund had waived WT's numerous breaches of the CBA and purportedly "minimal" (as erroneously characterized by the arbitrator) work after termination of the CBA because the Fund purportedly knew or should have known that the breaches and post-termination work were occurring, and the CBA did not expressly prohibit such activity.

76. The CBA did not contain an express provision prohibiting such activity because there is no reason that any collective bargaining agreement would have an express statement excluding such activity when, in fact, such activity is excluded by Federal law. 29 U.S.C. § 1383(b)(2)(b)(i).

77. There is no factual basis in the record to find that WT supervisors were tacitly permitted to do Laborers work.

78. There is no factual basis in the record supporting any finding that the Union, or the Fund, were on notice that WT supervisors were performing Laborers work prior to termination of the CBAs and, therefore, could not possibly grieve and certainly did not waive WT's unknown violations of its CBA prior to expiration.

79. Even if the members or officers of the Union knew that WT supervisors were

16

performing laborer's work and failed to file grievances, what the Union did or did not know has no bearing on what the Fund did or did not know – as the Fund is not bound by the failures of the Union officers and members, under ERISA. *See Operating Engineers Pension Trust v. Cecil Backhoe Serv., Inc.,* 795 F.2d 1501, 1507 (9th Cir.1986) ("The primary failing of [the employer's] estoppel argument is that it focuses almost exclusively on what the union or its representatives knew or intended, rather than on what the trust funds knew or intended."); *Trs. of the Oegonr.-Washington Carpenters-Employers Health & Welfare Tr. Fund v. Anders Certified Welding, Inc.,* No. 3:10- CV-01047-KI, 2011 WL 5599579, at *6 (D. Or. Nov. 16, 2011) (citing *Operating Engineers Pension Trust* 795 F.2d at 1507) ("Moreover, a union and its representatives are not agents of a trust fund created under a CBA. Thus, the trust fund cannot be estopped based on the actions of the union or its representatives.").

80. The Court should vacate the arbitrator's award because the fund was *not* on notice of the work performed by WT supervisors before and after the termination of the CBAs in violation of the CBAs, and therefore, did not and could not have waived this conduct.

### COUNT III: THE AWARD ALLOWS AND ENCOURAGES WT TO BENEFIT FROM ITS NUMEROUS BREACHES IN CONTRADICTION OF LONGSTANDING CONTRACT LAW DOCTRINE

81. The Fund incorporates by reference paragraphs 1-80 of the Complaint as if fully set forth herein.

82. It is undisputed that WT employees performed laborers work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required under 29 U.S.C. § 1383(b)(2)(B)(i) *both subsequent and prior* to the May 31, 2017 termination of the CBA, in breach of the CBA.

83. The arbitrator's ruling ignores volumes of record evidence that the work performed was substantial and occurred during even during the time the CBA was in effect, in breach of the

CBA, and without the Union or the Funds knowledge.

84. The Award, therefore, essentially rewards WT for its numerous breaches of the CBA, and encourages WT to conduct itself in this manner in the future.

85. As noted, *supra*, WT is one of the largest construction companies in the United States, and this decision could have widespread consequences should WT and other construction companies that contribute to defined benefit multiemployer pension plans be emboldened by this decision to breach their collective bargaining agreements elsewhere.

86. By essentially giving WT a pass on its breaches of the CBA, the Award is in complete contravention to longstanding precedent of contract law doctrine.

87. It is also axiomatic that a party cannot benefit from its own breach. *See Assaf v. Trinity Medical Center*, 696 F.3d 681, 686 (7th Cir.2012) ("[A] classic rule of contract law, is that a party should be prevented from benefitting from its own breach.") (quoted by *Montgomery Cty. v. Managed Care Innovations*, LLC, 261 F. Supp. 3d 567, 576-77 (D. Md. 2017); *Gencorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999) ("it is also axiomatic that a party cannot benefit from its own breach."); *Pac. Indem. Co. v. Deming*, 140 F. Supp. 3d 152, 161 (D. Mass. 2015) (same) (citing *P.R. Tel. Co. v. Telecomm Regulatory Bd. of P.R.*, 15 F. Supp. 3d 162, 171 (D.P.R. 2014); *see also Pac. Indem. Co. v. Deming*, 140 F. Supp. 3d 152, 161 (D. Mass. 2015) ("Finally, allowing Pacific to recover from another Unit Owner (or in this case a tenant), because its insured breached his or obligation to obtain insurance containing a waiver of subrogation, would frustrate the clear intent of the condominium By-laws and allow Pacific to benefit from its insured's breach, an untenable result.").

88. The Court should vacate the arbitrator's award because allowing a party to benefit from its own breaches of contract (here, the CBA) is untenable and contrary to United States

jurisprudence.  Thus, the Award should be vacated.

## COUNT IV: THE AWARD IS MAKES CLEARLY ERRONEOUS FINDINGS OF FACT

89. The Fund incorporates by reference paragraphs 1-88 of the Complaint as if fully set forth herein.

90. The arbitrator made numerous, unsupported and erroneous findings of fact in reaching his decision.

91. The erroneous findings of fact include, but are not limited to, ignoring inconsistent false testimony by numerous WT executives and management, ignoring the extensive violations of WT's own corporate policies, and ignoring hundreds of hours of video evidence highlighting WT's violation of ERISA, which was neither minimal nor *de minimis*.

92. The Award should be vacated because these clearly erroneous findings of fact are material, and form the basis for the arbitrator's erroneous legal conclusions.

## PRAYER FOR RELIEF

WHEREFORE, the Fund respectfully requests that this Court enter judgment against WT and in favor of the Fund, and:

1. Vacate the arbitrator's award overturning the assessment of withdrawal liability;

2. Order WT to promptly pay all withdrawal liability payment amounts owed;

3. Order WT to pay the Fund's costs and expenses incurred in this action, including reasonable attorneys' fees; and

4. Grant other relief that this Court deems just and proper.

Respectfully Submitted,

Dated:  August 2, 2024              /s/ *Jonathan G. Rose*
                                    Jonathan G. Rose (MD Bar #15138)
                                    William F. Kiniry, III (MD Bar # 30240)
                                    DLA Piper LLP (US)
                                    500 Eighth Street, NW
                                    Washington, DC 20004
                                    Tel: 202-799-4310
                                    Fax: 202-799-5310
                                    jonathan.rose@us.dlapiper.com
                                    william.kiniryiii@us.dlapiper.com

                                    *Counsel for the Fund*